```
 1                      UNITED STATES DISTRICT COURT
                         DISTRICT OF MASSACHUSETTS
 2


 3


 4
        UNITED STATES OF AMERICA          )
 5                                        )
                                          )
 6      vs.                               )   CR No. 19-10081-IT
                                          )
 7                                        )
        STEVEN MASERA                     )
 8


 9


10
        BEFORE:   THE HONORABLE INDIRA TALWANI
11


12


13
                               PLEA
14


15


16              John Joseph Moakley United States Courthouse
                            Courtroom No. 9
17                          One Courthouse Way
                            Boston, MA 02210
18                       Thursday, June 27, 2019
                              10:06 a.m.
19


20


21                   Cheryl Dahlstrom, RMR, CRR
                         Official Court Reporter
22          John Joseph Moakley United States Courthouse
                      One Courthouse Way, Room 3510
23                        Boston, MA 02210
                 Mechanical Steno - Transcript by Computer
24


25
```

1    APPEARANCES:

2    ON BEHALF OF THE GOVERNMENT:

3        OFFICE OF THE UNITED STATES ATTORNEY
         By:  Justin D. O'Connell, AUSA
4             Eric S. Rosen, AUSA
         One Courthouse Way
5        Boston, Massachusetts 02210

6

     ON BEHALF OF THE DEFENDANT:
7
         TAFT STETTINIUS & HOLLISTER LLP
8        By:  Philip Yvan Kouyoumdjian, Esq.
         225 West 34th Street
9        New York, New York 10122

10       TAFT STETTINIUS & HOLLISTER LLP
         By:  Kathryn S. Wallrabenstein, Esq.
11            David H. Thomas, Esq.
         65 East State Street
12       Columbus, Ohio 43215

13

14

15

16

17

18

19

20

21

22

23

24

25

1                         P R O C E E D I N G S

2              THE CLERK:  U.S. District Court is now in session.

3    The Honorable Judge Indira Talwani presiding.  This is Case No.

4    19-cr-10081, United States v. Steven Masera.  Will counsel

5    please identify themselves for the record.

6              MR. O'CONNELL:  Good morning, your Honor.  Justin

7    O'Connell and Eric Rosen for the government.

8              THE COURT:  Good morning.

9              MS. WALLRABENSTEIN:  Good morning, your Honor.  Katie

10:06 10   Wallrabenstein on behalf of Mr. Masera.  Immediately on my

11   right is David Thomas, also counsel for Mr. Masera.  Steven

12   Masera is two to my right, your Honor; and, finally, on my far

13   right is Philip Kouyoumdjian, who is our local counsel, your

14   Honor.

15             THE COURT:  Good morning.

16             ALL:  Good morning, your Honor.

17             THE COURT:  So I understand that Mr. Masera wants to

18   plead guilty today.

19             MS. WALLRABENSTEIN:  Yes, your Honor.

10:07 20             THE COURT:  If you could please administer the oath.

21   (Defendant sworn.)

22             THE CLERK:  Please state your name for the record.

23             THE DEFENDANT:  Steven Masera.

24             THE CLERK:  Thank you.

25             THE COURT:  Mr. Masera, do you understand that you are

1    now under oath and that if you answer any of my questions

2    falsely your answers may later be used against you in another

3    prosecution for perjury or making a false statement?

4            THE DEFENDANT:  Yes, your Honor.

5            THE COURT:  You may consult with your counsel at any

6    point during these proceedings.

7            Your full name, please.

8            THE DEFENDANT:  Steven Robert Masera.

9            THE COURT:  And how old are you?

10:07 10          THE DEFENDANT:  Sixty-nine years old.

11           THE COURT:  What education level have you attained?

12           THE DEFENDANT:  I have a bachelor of science degree in

13    business administration.

14           THE COURT:  As you stand here today, are you under the

15    influence of any drug or alcoholic beverage of any kind?

16           THE DEFENDANT:  No, your Honor.

17           THE COURT:  Have you taken any medicine, prescription

18    or otherwise, that could affect your ability to understand

19    these proceedings and to testify truthfully?

10:08 20          THE DEFENDANT:  No, your Honor.

21           THE COURT:  Have you received any recent treatment for

22    any mental illnesses or psychological problems of any kind?

23           THE DEFENDANT:  No, your Honor.

24           THE COURT:  Have you received a copy of the

25    Indictment, the written charges against you in this case?

1          THE DEFENDANT:  Yes, your Honor.

2          THE COURT:  Count 1 charges you with a violation of 18

3     USC 1962(d), racketeering conspiracy, on or about 2011 through

4     February 2019.  The Indictment also includes forfeiture

5     allegations under 18 USC Section 1963(a).  Do you understand

6     the charges?

7          THE DEFENDANT:  For forfeiture?

8     (Discussion held off the record.)

9          MR. THOMAS:  May I have a moment, please, your Honor?

10:09 10          THE COURT:  Absolutely.

11     (Discussion held off the record.)

12          THE DEFENDANT:  Yes, your Honor.  Thank you.

13          THE COURT:  You understand that you're represented by

14     counsel?

15          THE DEFENDANT:  Yes, your Honor.

16          THE COURT:  Have you fully discussed the charges

17     against you and the facts and circumstances of this case with

18     your counsel?

19          THE DEFENDANT:  Yes, your Honor.

10:09 20          THE COURT:  Are you fully satisfied with the counsel,

21     representation, and advice given to you in this case by your

22     attorneys?

23          THE DEFENDANT:  I am, your Honor.

24          THE COURT:  Counsel, have you communicated all formal

25     offers from the prosecution to accept a plea on terms and

1    conditions that may be favorable to the accused?

2          MS. WALLRABENSTEIN:  Yes, your Honor.

3          THE COURT:  I understand there is a plea agreement.

4          MR. O'CONNELL:  Yes, your Honor.

5          THE COURT:  Is there -- there's -- the docket contains

6    more than just the plea agreement.

7          MR. O'CONNELL:  That's right, your Honor.

8          THE COURT:  Is there any issues that I should be

9    discussing at sidebar?

10:10 10        MR. O'CONNELL:  I don't believe so, your Honor.  We've

11    agreed with defense counsel that the other agreement would also

12    be publicly filed.

13          THE COURT:  Okay.  So you have entered into a plea

14    agreement, is that correct?

15          THE DEFENDANT:  Yes, your Honor.

16          THE COURT:  Did you sign the agreement?

17          THE DEFENDANT:  Yes, I did.

18          THE COURT:  And the document I have is -- appears to

19    be signed on May 29th.  Is that your signature?

10:10 20        THE DEFENDANT:  Yes, it is, your Honor.

21          THE COURT:  And did you have an opportunity to read

22    the agreement and discuss it with your lawyer before you signed

23    it?

24          THE DEFENDANT:  Yes, your Honor.

25          THE COURT:  Does the plea agreement contain all of the

1      terms to which you have agreed?

2              THE DEFENDANT:  Yes, your Honor.

3              THE COURT:  Do you understand the terms of the plea

4      agreement?

5              THE DEFENDANT:  Yes, your Honor.

6              THE COURT:  And you have also entered into a

7      cooperation agreement with the United States Attorney's Office,

8      is that correct?

9              THE DEFENDANT:  Yes, your Honor.

10:11 10        THE COURT:  Did you sign that agreement?

11             THE DEFENDANT:  Yes, your Honor.

12             THE COURT:  And did you have an opportunity to read

13     that agreement and discuss it with your lawyers before you

14     signed it?

15             THE DEFENDANT:  Yes, your Honor.

16             THE COURT:  Does that agreement contain all of the

17     terms there to which you have agreed?

18             THE DEFENDANT:  Yes, your Honor.

19             THE COURT:  Do you understand the terms of these

10:11 20   agreements?

21             THE DEFENDANT:  Yes, your Honor.

22             THE COURT:  Do you understand that these agreements

23     are the only agreements that you have with the United States

24     Government?

25             THE DEFENDANT:  Yes, your Honor.

1    THE COURT:  Has anyone made any promises or assurances

2    to you that are not in these two agreements?

3    THE DEFENDANT:  No, your Honor.

4    THE COURT:  Has anyone made any threats or pressured

5    you in any way to persuade you to accept these agreements?

6    THE DEFENDANT:  No, your Honor.

7    THE COURT:  And do you understand that you cannot

8    withdraw your plea if I do not accept the sentencing

9    recommendation?

10:12 10    THE DEFENDANT:  Yes, your Honor.

11    THE COURT:  And do you understand that these terms of

12    the plea agreement are merely recommendations, and I can reject

13    them without permitting you to withdraw your plea of guilty,

14    and I could impose a sentence that may be more severe than you

15    anticipate?

16    THE DEFENDANT:  Yes, your Honor.

17    THE COURT:  And do you understand further that, with

18    regard to the cooperation agreement, the determination as to

19    whether the -- whether you've provided substantial assistance

10:12 20    rests solely in the discretion of the U.S. Attorney and is not

21    subject to appeal or review?

22    THE DEFENDANT:  Yes, your Honor.

23    THE COURT:  Okay.  Are you pleading guilty of your own

24    freewill?

25    THE DEFENDANT:  Yes, your Honor.

1          THE COURT:  Do you understand the offense to which

2     you're pleading guilty is a felony?

3          THE DEFENDANT:  Yes, your Honor.

4          THE COURT:  Do you understand, if I accept your plea,

5     you will be judged guilty of that offense?

6          THE DEFENDANT:  Yes, your Honor.

7          THE COURT:  Do you understand that by being judged

8     guilty you may lose valuable civil rights, including the right

9     to vote in many states, to hold public office, to serve on a

10:13 10    jury, and the right to possess a gun or any kind of firearm or

11    ammunition?

12         THE DEFENDANT:  Yes, your Honor.

13         THE COURT:  And are you a United States citizen?

14         THE DEFENDANT:  Yes, your Honor.

15         THE COURT:  Okay.  I'm going to turn now to the

16    assistant U.S. attorney.  Could you please state the maximum

17    possible penalties provided by law and any applicable mandatory

18    minimums.

19         MR. O'CONNELL:  Yes, your Honor.  The defendant was

10:13 20    charged in a one-count Indictment unsealed on March 12, 2019,

21    with racketeering conspiracy in violation of Title 18 United

22    States Code Section 1962(d).  The maximum penalties for that

23    offense are as follows:  incarceration for 20 years; supervised

24    release for three years; a fine of $250,000 or twice the gross

25    gain or loss from the offense, whichever is greater; a

1    mandatory special assessment of $100; restitution; and

2    forfeiture, as applicable, but I would note that there is no

3    specific forfeiture allegations in the Indictment against Mr.

4    Masera.

5          THE COURT:  Okay.  And the disposition that the

6    government has agreed to recommend under the plea agreement is

7    what?

8          MR. O'CONNELL:  Under the plea agreement, the

9    government has agreed to recommend incarceration at the low end

10:14 10    of the guidelines set forth here.  That determination would be

11    a 25 offense level so a 55-month period; a fine within the

12    guideline range, which is 20,000 to $200,000; 12 months of

13    supervised release; a mandatory special assessment of $100;

14    restitution in the amount to be determined by the Court at

15    sentencing; and, as I stated, forfeiture, but there's no

16    specific allegations of forfeiture.

17          THE COURT:  Thank you.  Okay.

18          Mr. Masera, do you -- I want to just -- we spoke

19    briefly there about the guidelines.  I want to make sure you

10:15 20    understand those and then what the potential penalties are

21    here.

22          The guidelines are not mandatory.  That means I do not

23    have to follow them.  I do have to consider them, and I do have

24    to make a determination as to what the appropriate guideline

25    is.  You have in your agreement the government's position as to

1    the guideline sentence, and I believe the agreement includes

2    your position that a guideline sentence is slightly lower than

3    that.

4          But do you understand that I cannot make a

5    determination of your guideline sentence until after the

6    Probation Office has prepared a Presentence Report?

7          THE DEFENDANT:  Yes, your Honor.

8          THE COURT:  And do you understand that I may make a

9    different analysis of how the guidelines apply than you and the

10:16 10    government have done?  Do you understand that?

11          THE DEFENDANT:  Yes, your Honor.

12          THE COURT:  And do you understand that the Presentence

13    Report that will be prepared by the Probation Office will

14    contain information about you, any criminal history, any crimes

15    you've committed, and any uncharged or dismissed conduct, and I

16    may consider all of this information in applying the

17    guidelines?

18          THE DEFENDANT:  Yes, your Honor.

19          THE COURT:  And do you understand that, while you'll

10:17 20    have the opportunity to read the report, to make objections and

21    challenge any of the facts, I need only find the facts to a

22    preponderance of the evidence?  Do you understand that?

23          THE DEFENDANT:  Yes, your Honor.

24          THE COURT:  And do you understand then under this

25    guideline system I have the authority both to reach a different

1    determination of the guidelines than you and counsel have, and

2    I also have the authority to depart from the guideline sentence

3    and impose a sentence that is more or less severe than the

4    guidelines call for?  Do you understand that?

5                THE DEFENDANT:  Yes, your Honor.

6                THE COURT:  And do you understand that, because I'm

7    not required to follow the guidelines, I have the legal

8    authority to sentence you anywhere up to the maximum sentence

9    as long as the sentence I impose is reasonable under the

10:18 10   circumstances?

11                THE DEFENDANT:  Yes, your Honor.

12                THE COURT:  And do you understand that, as set forth

13   by the assistant U.S. attorney, the maximum sentences here are

14   20 years on Count 1; supervised release of three years on Count

15   1; a fine of 250,000 or twice the gross gain or loss; a special

16   assessment of $100; and restitution?  Do you understand that?

17                THE DEFENDANT:  Yes, your Honor.

18                THE COURT:  And do you understand you will not be

19   permitted to withdraw your plea of guilty if your sentence is

10:18 20   longer or different than you expect?

21                THE DEFENDANT:  Yes, your Honor.

22                THE COURT:  Okay.  So I'm going to go now through the

23   pretrial and trial -- sorry.

24                Do you understand there may be legal challenges to the

25   charges brought against you here, such as challenges to venue,

1    motions to suppress, challenges to the -- as a legal defect in

2    the Indictment, and I have -- you will have waived all of those

3    legal challenges if I accept your plea of guilty?  Do you

4    understand that?

5              THE DEFENDANT:  Yes, your Honor.

6              THE COURT:  And do you understand also that you have

7    these trial rights that you would be waiving?  First of all, do

8    you understand you have the right to plead not guilty to the

9    offense charged against you and to go to trial?

10:19 10        THE DEFENDANT:  Yes, your Honor.

11             THE COURT:  Do you understand you have the right to a

12   trial by jury?

13             THE DEFENDANT:  Yes, your Honor.

14             THE COURT:  And that a jury is composed of 12 jurors

15   who must find beyond a reasonable doubt that you committed the

16   crime with which you're charged before you may be found guilty?

17             THE DEFENDANT:  Yes, your Honor.

18             THE COURT:  At trial, you would be presumed to be

19   innocent, and the government would have to prove your guilt

10:19 20   beyond a reasonable doubt?

21             THE DEFENDANT:  Yes, your Honor.

22             THE COURT:  And you understand, at trial, you would

23   have the right to the assistance of counsel for your defense?

24             THE DEFENDANT:  Yes, your Honor.

25             THE COURT:  And you would have the right to see and

1   hear all the witnesses against you and have them cross-examined

2   in your defense?

3            THE DEFENDANT:  Yes, your Honor.

4            THE COURT:  And you would have the right, if you chose

5   to exercise it, to testify and put on evidence in your defense?

6            THE DEFENDANT:  Yes, your Honor.

7            THE COURT:  And you would have the right to require

8   witnesses to come to court to testify in your defense?

9            THE DEFENDANT:  Yes, your Honor.

10:20 10          THE COURT:  And you would have the right to refuse to

11   testify and refuse to put on evidence unless you voluntarily

12   elected to do so?

13            THE DEFENDANT:  Yes, your Honor.

14            THE COURT:  If you decided not to testify or not to

15   put on any evidence, those facts could not be used against you?

16            THE DEFENDANT:  Yes, your Honor.

17            THE COURT:  And you further understand that, by

18   entering a plea of guilty here today, if I accept your plea,

19   there will be no trial, and you will have waived, or given up,

10:20 20   your right to a trial as well as the rights that come with a

21   trial that I've just described?

22            THE DEFENDANT:  Yes, your Honor.

23            THE COURT:  Okay.  Your plea agreement also has an

24   appeal waiver.  I appreciate that this is modified from some of

25   the earlier ones that we have seen.

1        Mr. Masera, do you understand that, but for the waiver

2   of rights, there is a right to appeal a sentence and

3   conviction?

4        THE DEFENDANT:  Yes, your Honor.

5        THE COURT:  And do you understand that, but for the

6   terms set forth in the plea agreement that waives your right,

7   you may have been able to argue in a future proceeding,

8   collateral or otherwise, that your conviction should be set

9   aside or reduced?

10       THE DEFENDANT:  Yes, your Honor.

11       THE COURT:  And you understand that, but for these

12  terms, you would have had a right to appeal your sentence or

13  seek a reduced sentence in circumstances set forth there, that

14  you would have that right but for those terms?

15       THE DEFENDANT:  Yes, your Honor.

16       THE COURT:  And do you understand that under your

17  agreement you have agreed not to challenge any prison sentence

18  of 71 months or less or any court orders relating to

19  forfeiture, restitution, fines, or supervised release?  Do you

20  understand that?

21       THE DEFENDANT:  Yes, your Honor.

22       THE COURT:  And you understand that this provision is

23  binding even if my analysis of the guidelines is different than

24  the one in the agreement?

25       THE DEFENDANT:  Yes, your Honor.

1          THE COURT:  And the U.S. Attorney has agreed that

2     regardless of how I calculate the guidelines that the U.S.

3     Attorney will not appeal any sentence of imprisonment of 57

4     months or more.

5          Do you understand that by so agreeing here, if I

6     accept your plea, your conviction and sentence will be final

7     when I issue a written judgment after sentencing hearing in

8     this case and that you will lose the right to appeal or

9     otherwise challenge your conviction and sentence regardless of

10:22 10     whether you later change your mind or find new information that

11     would have led you to agree -- not to agree to give up these

12     rights?  Do you understand?

13          THE DEFENDANT:  Yes, your Honor.

14          THE COURT:  And that notwithstanding this waiver you,

15     as all defendants, reserve the right to claim your lawyer was

16     ineffective in connection with the negotiation of the plea or

17     entry of the guilty plea or that the prosecutor engaged in

18     misconduct.

19          So with that, let me turn to the elements of the

10:23 20     offense here and then ask the government as to the evidence

21     that they would present at trial.

22          So Count 1 -- there's only one count -- charges you

23     with a conspiracy to commit racketeering.  And if the case went

24     to trial, the government would have to prove that there was a

25     pattern of racketeering activity substantially as stated in the

1      Indictment, that is, to facilitate cheating on the college

2      entrance exams; to facilitate the admission of students to

3      elite universities as recruited athletes regardless of their

4      abilities, and to enrich defendants personally.  It was part of

5      the conspiracy that each of the defendants agreed that the

6      conspirators would commit at least two acts of racketeering

7      activity and that you conspired to participate or benefit from

8      the racketeering activity.

9            So with that, do you understand those are the elements

10:24 10   the government would have to prove?  Have I misstated them?

11            MR. O'CONNELL:  No, no.  I think, your Honor, I'd just

12     add that the defendant did not have to personally engage in the

13     --

14            THE COURT:  I think I corrected that from Ms. Janke's

15     plea colloquy.

16            MR. O'CONNELL:  Thank you, your Honor.

17            THE COURT:  That this is a conspiracy charge, not an

18     individual RICO charge, and as long as members of the

19     conspiracy -- that you agreed that members of the conspiracy

10:24 20   would commit at least two of these acts, that's sufficient.  Do

21     you understand that?

22            THE DEFENDANT:  Yes, your Honor.

23            THE COURT:  So with that, if the government could

24     describe the evidence that the government is prepared to

25     present if the case were to go to trial.

1          MR. O'CONNELL:  Yes, your Honor.  If this case were to

2     have proceeded to trial, the evidence would show, through

3     recorded telephone calls, emails, financial records, witnesses,

4     and other evidence, that Steve Masera was the bookkeeper for

5     William "Rick" Singer's for-profit business called The Edge

6     College and Career Network, otherwise known as The Key, as well

7     as Singer's nonprofit business, the Key Worldwide Foundation,

8     or KWF.

9          In that capacity, from approximately 2007 through

10:25 10    2017, Masera conspired with Singer and others to secure the

11    admission of Singer's clients to elite universities through

12    fraud and bribe payments.  Specifically, Masera played a role

13    in this scheme by assisting Singer's use of KWF and The Key to

14    launder approximately $21 million in bribe payments from

15    Singer's families to corrupt coaches and administrators.  In

16    addition, to further conceal the elicit nature of these bribe

17    payments, Masera provided his co-conspirators with fraudulent

18    documentation such as sham business consulting agreements or

19    invoices and charitable donation letters to allow the people

10:26 20    paying the bribes to take tax deductions.

21          THE COURT:  I'm sorry.  The business consulting

22    agreements, what were those?

23          MR. O'CONNELL:  I misspoke.  It's actually sham

24    invoices, and we'll get to an example of that type of conduct,

25    your Honor.

1          THE COURT:  Sham invoices and sham receipts.

2          MR. O'CONNELL:  Sham donation receipts and invoices,

3    correct, your Honor.

4          THE COURT:  Thank you.

5          MR. O'CONNELL:  By way of example, Masera helped

6    Singer facilitate the side-door admission of the following two

7    children, one to Georgetown and one to USC, by way of bribe

8    payments and fraud.  I'll refer to these students as Student 1

9    and Student 2 for today's purposes.

10:26 10          With respect to Student 1, the evidence would show

11   that beginning in or about 2012 Student 1's mother, who is a

12   charged defendant, agreed to pay a bribe ultimately totaling

13   $275,000 to secure the admission of Student 1 to Georgetown as

14   a recruited tennis player.  In or about December 2012, Student

15   1 received what is known as a likely letter that is given to

16   Georgetown tennis recruits that stated that she had a 95

17   percent likelihood of admission.

18          The following month, on or about January 16, 2013,

19   while copying Masera, Singer emailed Student 1's mother and

10:27 20   father regarding their initial bribe payment.  In that email

21   Singer said, "As agreed to, once the likely letter comes, we

22   need to have a deposit.  Normally a family provides us with no

23   less than 125 upon acceptance of a likely letter and the other

24   half within a week of the final acceptance," meaning when the

25   student was formally admitted by the university.

1           THE COURT:  Let me -- is this an email that Mr. Masera

2     is copied on?

3           MR. O'CONNELL:  Correct, your Honor.

4           THE COURT:  Thank you.

5           MR. O'CONNELL:  Student 1's mother replied, also

6     copying Mr. Masera, "To get a check cut, I will also need

7     something showing the money is going to a 501(c)(3)."

8           On or about April 15th of that same year, 2013, an

9     foundation controlled by Student 1's family mailed a $100,000

10:28 10     check to KWF.  On that same day, Masera emailed Student 1's

11     mother a donation letter that falsely stated, and I quote,

12     "Thank you for your contribution of 100,000 to the Key

13     Worldwide Foundation.  Your generosity will allow us to move

14     forward with our plans to provide educational and

15     self-enrichment programs to disadvantaged youth.  This letter

16     shall serve as formal acknowledgment of your contribution for

17     which no goods or services were exchanged."

18           Thereafter, throughout 2013, Masera mailed checks out

19     of the KWF bank account typically in the range of about $20,000

10:29 20     per month to the Georgetown tennis coach in return for helping

21     secure the admission of Student 1 and other of Singer's

22     clients.

23           With respect to Student 2, the evidence would show

24     that beginning in or about 2013 Student 2's father, who was a

25     charged defendant, agreed to pay a bribe ultimately totaling

1    2 --

2    THE COURT:  Can I just interrupt you here?  You said

3    the parent for Student 1 was a charged --

4    MR. O'CONNELL:  The mother is a charged defendant.

5    THE COURT:  Mother was a charged defendant.  Thank

6    you.

7    MR. O'CONNELL:  With respect to Student 2, the father

8    is a charged defendant.

9    THE COURT:  Thank you.

10:30 10    MR. O'CONNELL:  So the father agreed to pay a bribe

11    ultimately totaling $220,000 to secure Student 2's admission to

12    USC as a recruited water polo player.

13    On or about February 28, 2014, a USC admissions

14    subcommittee dedicated to evaluating athletic recruits voted to

15    admit Student 2 as a water polo recruit.

16    The following day, on or about March 1, 2014, Student

17    2's father asked Singer, "Thanks again for making this happen.

18    Please give me an invoice.  What are the options for payments?

19    Can we make it for consulting or whatever from The Key so I can

10:30 20    pay it from my corporate account?"  Singer replied, copying the

21    defendant, Mr. Masera, "Yes, we can.  Send you an invoice for

22    business consulting fees, and you may write it off as an

23    expense."

24    Despite knowing that the charged defendant's company

25    did not do any consultation for any of Singer's businesses,

including The Key, on or about March 31, 2014, Masera told an

executive assistant working for Student 2's father, "What I

have planned was to send an invoice to our foundation, the

501(c)(3), for $100,000 and a consulting invoice for business

for the other 100,000.  This would leave the 20,000 for Rick

Singer."

        The following day, Masera sent Student 2's father the

following fraudulent documents:  first, a donation letter that

falsely claimed that no goods or services were exchanged for

the $100,000 in payments to the Key Worldwide Foundation;

second, an invoice from The Key to the business owned by

Student 2's father for $100,000 that falsely claimed to be for

"business consulting" from August through June 2014; and an

invoice from Rick Singer to the charged defendant's business --

I'm sorry, to Student 2's father's business for $20,000.

        Less that a week later, Student 2's father caused a

$100,000 wire to be sent to the KWF, another $100,000 wire to

be sent to The Key, and a $20,000 wire to be sent to Rick

Singer's personal bank account.

        On or about April 16, 2014, Masera then mailed a

$100,000 cashier's check from KWF to a USC bank account

controlled by the water polo coach with a memo line identifying

with the name of -- the last name of Student 2.

        THE COURT:  Thank you.

        The one detail there that was -- that may not

1    particularly matter for this plea colloquy, but you're saying

2    there was a separate check for Mr. Singer?

3         MR. O'CONNELL:  There was, your Honor.

4         THE COURT:  Different from the other two checks?  It's

5    different than the other two enterprises?

6         MR. O'CONNELL:  That's right.  There was -- in the

7    last example with Student 2, it was actually, I believe, a wire

8    that was sent, but there were three separate wires sent on the

9    same day that tracked the three invoices and donation letters

10:33 10   that Mr. Masera sent.

11        THE COURT:  Thank you.

12        Mr. Masera, did you understand the facts recited by

13   the assistant U.S. attorney?

14        THE DEFENDANT:  Yes, your Honor.

15        THE COURT:  Do you have any dispute with those facts?

16        THE DEFENDANT:  Yes.

17        THE COURT:  Okay.

18        MR. THOMAS:  May I have a moment, your Honor?

19        THE COURT:  Yes.

10:34 20   (Discussion held off the record.)

21        THE DEFENDANT:  Yes, your Honor.

22        MR. THOMAS:  Judge, we're putting out additional

23   facts, not an inaccurate fact.

24        THE COURT:  I would like to -- I understand there is a

25   plea agreement, and we're not looking to upend that agreement.

1    But I do want to make sure -- each member of the conspiracy may

2    or may not have the information as to the whole conspiracy.

3    That may not matter as to a finding of guilt, but I do want the

4    record to be correct.

5        So maybe what we should do is just sort of break down

6    to the pieces of this that you have your -- that you're alleged

7    to have your hands on directly, and then we can work backwards

8    from that.

9        The government alleges that there was -- that your

10:35 10    role in this conspiracy was to be sending out invoices and

11    receipts that were fraudulent in the sense that, while they

12    accounted for the dollars that came in -- they matched that --

13    they in -- that they stated, on the charitable ones, that no

14    goods or services were received; that they purported -- in the

15    consulting services situation, they purported to be for

16    services different than what happened; and that you were aware

17    that this was done to cover up the arrangements that Mr. Singer

18    was making.

19        THE DEFENDANT:  Yes, your Honor.

10:36 20        THE COURT:  Any disagreement with that?

21        THE DEFENDANT:  No, none.

22        THE COURT:  Okay.  And the -- and that included in

23    turning this around was sending out letters on this alleged

24    charity letterhead essentially saying that these donations were

25    allowing education programs for disadvantaged youth when, in

1    fact, this was being used for other purposes.

2            THE DEFENDANT:  Yes, your Honor.

3            THE COURT:  And that -- the period of time that Mr.

4    Masera was involved with this ended in 2017, is that correct?

5            MR. O'CONNELL:  That's right.  Mr. Masera left The Key

6    before the takedown in 2019.

7            THE COURT:  Okay.  Thank you.

8            So with regard to the facts that I've just clarified

9    with Mr. Masera, do you have any disagreement that those facts

10:37 10   are sufficient here?

11           MR. O'CONNELL:  I think those are sufficient.  I would

12   only add that he also had insight to the payment to the

13   coaches.  So he was taking the funds and then paying them out

14   at the back end as well.

15           THE COURT:  Thank you.

16           So any disagreement with that, that you were

17   responsible for sending checks to coaches or others related to

18   this conspiracy and this scheme to pay for these attempted

19   admissions?

10:37 20          THE DEFENDANT:  At the request of Rick Singer, yes,

21   ma'am, I sent every one of those checks.

22           THE COURT:  Yes.  So I don't think there's any

23   allegation that you were doing things that were not asked by

24   Mr. Singer here.  So everything here -- I believe we're

25   understanding this to be that you were taking these steps as

1    directed by Mr. Singer.

2              THE DEFENDANT:  Correct, yes.

3              THE COURT:  But at the same time, Mr. Singer included

4    you in the email correspondence, et cetera, so that you had at

5    least a general understanding of this conspiracy, correct?

6              THE DEFENDANT:  Can I tell you what --

7              THE COURT:  Yes.

8              THE DEFENDANT:  -- his reason was?  He didn't have

9    time or wouldn't take time to call me individually and tell me

10:38 10   what needed to be done.  He would include me in emails to

11   parents or coaches where I would get addresses and information

12   to do the billing or to send the checks.

13             THE COURT:  Right.  So understanding that he was the

14   one negotiating the transactions and completing these deals and

15   making these arrangements, my question really was that you were

16   aware that that's what he was doing, and then you were

17   fulfilling his directions to you in that regard?

18             THE DEFENDANT:  Yes, your Honor.

19             THE COURT:  Okay.  So then are you, in fact, guilty of

10:39 20   the count charged?

21             THE DEFENDANT:  Yes, your Honor.

22             THE COURT:  And, Counsel, is there any reason I should

23   not take the change of plea?

24             MS. WALLRABENSTEIN:  No, your Honor.

25             THE COURT:  So I will now take -- have the clerk take

1    the change of plea, please.

2    THE CLERK:  You are charged in an Indictment with,

3    Count 1, racketeering conspiracy, all in violation of Title 18

4    United States Code Section 1962(d).  You have previously pled

5    not guilty to this charge.  Do you now wish to change your

6    plea?  Yes or no.

7    THE DEFENDANT:  Yes.

8    THE CLERK:  How do you now plead to Count 1, guilty or

9    not guilty?

10:39 10    THE DEFENDANT:  Guilty.

11    THE CLERK:  Thank you.

12    THE COURT:  The Court finds the defendant is fully

13    competent and capable of entering an informed plea, that he is

14    aware of the nature of the charges and the consequences of the

15    plea, and that the plea of guilty is a knowing and voluntary

16    plea, supported by an independent basis in fact, containing

17    each of the essential elements of the offense charged.  The

18    plea is therefor accepted, and the defendant is now judged

19    guilty of this offense.

10:40 20    So you may be seated.

21    You've probably already gone through this with your

22    attorneys, but I am just going to repeat here one more time

23    about the Presentence Report which will be prepared by the

24    Probation Office to assist me in determining your sentence.

25    You will be asked to give information.  Your attorneys may be

1    present if you wish.  It is important that the report is

2    accurate.  That will affect not only what sentence you receive

3    but what happens to you after you're sentenced.  For example,

4    if you're sent to prison, it will affect where you're sent and

5    what happens when you get there.  Even minor mistakes in the

6    report should be corrected.  You'll have a chance to read the

7    report, as will your counsel, to file objections before the

8    time of sentencing.

9         It is my practice to accept or to hear a specific

10:41 10   recommendation from the Probation Office that is not shared

11   with the parties.  Such recommendations will not consider any

12   facts that are not already included in the Presentence Report

13   and known to both you and the government.  If you have

14   objections to my meeting with the probation officer or

15   receiving such a recommendation, I guess I would say that I

16   don't do that, although in this case, given that there are

17   multiple defendants with multiple -- with similar -- related

18   charges, I will certainly be meeting at least with whichever

19   defendants -- in whichever defendants' cases there are no such

10:41 20   objections.  At any rate, with that, I will refer -- any

21   objection should be filed at the time that objections to the

22   Presentence Report are due.

23        With that, do we have a date for sentencing?  October

24   22nd at 2:15.  Sentencing memoranda are due a week before

25   sentencing.

1          We have the same conditions of release, I --

2          MR. O'CONNELL:  Yes, your Honor.

3          THE COURT:  Okay.  So, Mr. Masera, those same

4    conditions of release remain in place.  And I find by clear and

5    convincing evidence that the defendant is not likely to flee or

6    pose a danger to any other person or community if released

7    pending sentencing.  All of the same conditions remain in

8    effect, and violation of any of those conditions may result in

9    the immediate issuance of a warrant for your arrest, revocation

10:42 10   of release, order of detention, forfeiture of bond or

11   prosecution for contempt of court.

12          And if, while on release, you commit any federal

13   felony, punishment is an additional prison term of not more

14   than ten years; federal misdemeanor, punishment is an

15   additional prison term of not more than one year.  If, after

16   release, you knowingly fail to appear as required, a fine and

17   term of imprisonment may be imposed for that.

18          With that, anything else we need to address?

19          MR. O'CONNELL:  Nothing, your Honor, from the

10:43 20   government.

21          MS. WALLRABENSTEIN:  No, your Honor.  Thank you.

22          THE COURT:  I'll see you in October.

23          THE CLERK:  Court is in recess.  All rise.

24   (Whereupon, at 10:44 a.m. the hearing concluded.)

25

1                    C E R T I F I C A T E

2

3

4           I certify that the foregoing is a correct transcript

5     of the record of proceedings in the above-entitled matter to

6     the best of my skill and ability.

7

8

9

10

11

12     /s/Cheryl Dahlstrom

13     Cheryl Dahlstrom, RMR, CRR

14     Official Court Reporter

15

16     Dated:  June 30, 2019

17

18

19

20

21

22

23

24

25