**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| Plaintiff, | : | CASE NO. 19-CR-10081-IT-5 |
| vs. | : | JUDGE TALWANI |
| STEVEN MASERA, | : | MAGISTRATE JUDGE KELLEY |
| Defendant. | : | |

**SENTENCING MEMORANDUM OF DEFENDANT STEVEN MASERA**

Defendant Steven Masera, through undersigned counsel, respectfully submits the following Sentencing Memorandum for the Court's consideration pursuant to 18 U.S.C. § 3553.

Respectfully submitted,
**Taft Stettinius & Hollister LLP**

**/s/ David H. Thomas**
DAVID H. THOMAS
Ohio Supreme Court No. 0071492
P: (614) 334-6199
dthomas@taftlaw.com

**/s/ Kathryn S. Wallrabenstein**
KATHRYN S. WALLRABENSTEIN
Ohio Supreme Court No. 0092172
65 East State Street, Suite 1000
Columbus, Ohio 43215
P: (614) 220-0238
F: (614) 221-2007
kwallrabenstein@taftlaw.com

Counsel for Defendant

/s/ Philip Y. Kouyoumdjian
PHILIP Y. KOUYOUMDJIAN
Massachusetts Bar No. 633443
14 Penn Plaza
225 West 34th Street, Suite 2102
New York, NY 10122
P: (917) 534-7180
F: (312) 966-8555
pkouyoumdjian@taftlaw.com

Local Counsel for Defendant

## MEMORANDUM

**FACTUAL AND PROCEDURAL BACKGROUND:**

Steven Masera pled guilty to one count of racketeering conspiracy (Count 1) of the Indictment on June 27, 2019. Mr. Masera agrees with the sentencing calculations submitted by U.S. Probation, which are also set forth the plea agreement between the parties. Mr. Masera's Total Offense Level is 23 and his corresponding sentencing guidelines range is 46-57 months imprisonment. Undersigned counsel, on behalf of Mr. Masera, respectfully submit that a noncustodial sentence would be appropriate in this case.

**REASONS IN SUPPORT OF A NONCUSTODIAL SENTENCE:**

Mr. Masera respectfully submits that a term of probation would satisfy the purposes of sentencing as set forth in 18 U.S.C. § 3553(a). While below the otherwise applicable guideline range, a sentence of probation would be consistent with the section 3553 factors and would be reasonable based upon the particular facts and circumstances in this case.

***The nature and circumstances of the offense and the history and characteristics of Steven Masera support a probationary sentence.***
***18 U.S.C. § 3553(a)(1)***

A reasonable sentence considers the nature and circumstances of the offense and the history and characteristics of the defendant pursuant to § 3553(a)(1). Undersigned counsel, on behalf of Mr. Masera, respectfully submit that both the nature and circumstances of the offense and the history and characteristics of Mr. Masera justify a probationary sentence.

While Mr. Masera's parents were of modest means, they taught Mr. Masera to handle life's challenges with grace. Mr. Masera's ability to describe his childhood in overwhelming positive terms, despite his mother's significant mental health issues that undoubtedly impacted him and his siblings, demonstrates the values his parents instilled in him. His mother suffered from what would now likely be diagnosed as bipolar disorder; however, his mother was not afforded the more effective treatments and therapy available currently and instead was subjected to more rudimentary and ineffective treatments, including electroshock therapy. As a child, Mr. Masera would watch his mother go from giggling to screaming at him. Her condition manifested with further odd behaviors, such as coming into his room in the middle of the night, turning on the lights, and vacuuming. Despite these experiences, Mr. Masera chose to focus on the positive experiences with his mother and he chose to understand that the less positive aspects were reflective of her mental health condition. Through his mother, Mr. Masera learned the concepts of unconditional love, empathy, and forgiveness.

Mr. Masera's grandfather immigrated to the United States from Italy and, after serving in World War I, secured citizenship and started a peach and almond ranch. Mr. Masera's father was also a hardworking peach farmer who never complained regardless of the challenging circumstances he faced at any given time. Mr. Masera first began working in his father's orchards

3

at the age of five, and continued until he went to college. Mr. Masera learned the concepts of hard work, positivity, and thoughtfulness from his father. Mr. Masera always strived to live up to the standards set by his father's example. Indeed, Mr. Masera worked two jobs while in college to pay for his own tuition.

During and after college, and throughout much of his life, Mr. Masera has worked multiple jobs simultaneously. Mr. Masera operated Masera Sales, a wholesale grocery company, for nearly three decades. He earned relatively modest profits from this business until he closed it in 2010 due to loss of suppliers and increased work demands at his secondary employment at The Edge Career and College Network LLC doing business as "The Key." Mr. Masera worked for The Key and The Key Worldwide Foundation ("KWF"), which are the two entities Rick Singer created that are involved in the offense conduct at issue, from February 2008 until December 2017 when he resigned. Mr. Masera has been employed by Cummings Properties since October 1, 2015. Claudia Cummings, the owner of the company, described Mr. Masera to U.S. Probation as the best employee the company has had.

Mr. Masera and his wife, Michelle, will be celebrating their fourth decade of marriage later this month. The couple have navigated many challenges throughout their life together, including Michelle surviving breast cancer. Mr. Masera is grateful for her presence in his life and she remains supportive of him as he resolves this matter. The couple are rightfully proud of their two children, Meghan and Matthew, and their four grandchildren, all of whom reside in California near Mr. Masera. Meghan, like Mrs. Masera, is also a breast cancer survivor. Matthew is a chef and culinary director and Meghan is chief legal counsel at a lobbying firm. In addition to living in close proximity, Mr. Masera's children keep in touch with him on a daily basis. They have provided their unwavering support for their father throughout the pendency of these proceedings.

Mrs. Masera had a daughter, Heidi, prior to her marriage to Mr. Masera, and Mr. Masera treats Heidi as one of his own children. Heidi has also remained supportive of her step-father. Mr. Masera's children's success, as well as the love and support they have provided to Mr. Masera during this stressful period, demonstrate the values that Mr. Masera was able to pass along to the generation after his own.

Mr. Masera first began to work for Rick Singer on a part-time basis in February 2008. He worked approximately sixteen to twenty hours each week as a bookkeeper. Mr. Singer paid Mr. Masera $50 per hour for the first nine years of his employment. This was increased to $75 per hour for the last year of his employment, before Mr. Masera resigned and began working solely for Cummings Properties. In the year before Mr. Masera was hired, Mr. Singer had started a criminal enterprise using The Key – a for-profit college counseling and preparation business – and The Key Worldwide Foundation ("KWF") – a non-profit cooperation that purportedly provided educational and self-enrichment programs to disadvantaged youth.

There has been an extraordinary amount of media coverage and litigation related to Mr. Singer's college entrance exam cheating scheme and college recruitment scheme, which are now collectively known as the college admissions case. Mr. Singer masterminded plans to cheat on standardized college admissions tests using bribes and fraud and to secure admission of otherwise unqualified students at elite colleges and universities as purported athletic recruits. U.S. Probation has accurately detailed much of the specific conduct that underlies the entire conspiracy. (PSI, ¶¶ 23-77). In short, Mr. Singer devised methods through which high school students could use various forms of cheating to acquire higher scores on college entrance exams, as well as methods for parents to secure their children's admission to elite colleges and universities through his creation of "side door" entry. While "front door" entry required admission based on merits

and/or genuine athletic ability, and "back door" entry required generous donations to the entities in hopes of securing admission for family members, Mr. Singer's "side door" consisted of illegal means through which students were accepted based on various acts of fraud. While some students who were admitted through this "side door" were aware of their parents' respective wrongdoing, other parents engaged in this behavior without their children's knowledge, participation, or consent.

Mr. Singer laundered approximately $25 million throughout the duration of the conspiracy. Mr. Masera was employed during the time that approximately $21 million was laundered. Mr. Singer directed Mr. Masera to communicate with various individuals who were seeking to obtain side door entry for their family members, and Mr. Singer further directed Mr. Masera to conduct various financial transactions and provide certain documentation to facilitate the college admissions schemes. For example, Mr. Masera would create and send invoices, track amounts owed, send donation receipts, and transfer money from KWF accounts to Mr. Singer's personal account, all at Mr. Singer's direction.

Mr. Masera regrets his actions, and wishes he had left his employment many years earlier. He became aware of the general nature of the schemes fairly quickly. Still, at times, Mr. Singer's requests of Mr. Masera were so layered in lies that discerning the exact nature of transactions was impossible unless Mr. Singer provided context. For example, during one transaction outlined by U.S. Probation, Mr. Singer had Mr. Masera provide an invoice for extensive tutoring services. Mr. Masera created and sent the invoice as directed. (PSI, ¶ 75). Unbeknownst to Mr. Masera at the time, the invoice was created for the College Board, which was threatening to cancel the scores of a student due to suspected cheating. Only when Mr. Masera attempted to collect on the

invoice, did Mr. Singer finally explain the invoice was entirely fictitious, and that Mr. Masera should not attempt to collect.

Aside from the nature of the financial transactions involved, Mr. Masera did not engage in any other financial wrongdoing despite having access to the significant amounts of money flowing through Mr. Singer's entities. Aside from his hourly wages, Mr. Masera did not profit from his conduct, either through bonuses or bribes from Mr. Singer, or through other financial wrongdoing such as embezzlement or extortion.

Indeed, after Mr. Masera was arrested, the banks that hold Mr. Masera's current employer's personal and business checking accounts conducted a review of past account activity. This review was undertaken at the banks' initiative, as Ms. Cummings had no concerns personally regarding Mr. Masera's handling of her assets. The review found no improper activity (Exhibit O).

Mr. Masera is ashamed that he would agree to be involved in such conduct, but is nevertheless handling the situation with grace. While he is unable to undo the criminal acts that bring him before this Court, he is using this experience as an opportunity to show his children and others the importance of accepting responsibility for one's actions. Mr. Masera by no means is attempted to downplay his wrongdoing; rather, the information above is being provided to contextualize his conduct and demonstrate the aberrant nature of this offense in Mr. Masera's otherwise law-abiding and productive life for the past seventy-two years.

### *Steven Masera understands the seriousness of his offense.*
### 18 U.S.C. § 3553(a)(2)(A) and § 3553(a)(2)(B)

The Court's sentence should reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense according to § 3553(a)(2)(A). This sentence should also adequately deter criminal conduct under § 3553(a)(2)(B). Mr. Masera appreciates the

seriousness of his offense and he has expressed genuine remorse for his actions. He has been able to reflect on his actions and has accepted full responsibility for them. This is best reflected in his disclosure of his illegal conduct to his family members, friends, and employer, who find his underlying criminal behavior to be out of character for Mr. Masera. As set forth in an abundance of letters in support of Mr. Masera attached hereto,[1] he is well aware of the consequences of his offense and how his conduct has negatively impacted his family and community. (Exhibits A to Z). Mr. Masera is his own harshest critic and there may be no worse punishment for him than his own crushing sense of guilt and shame, which his family and friends can feel radiating from him despite his attempts to put on a brave face.

Mr. Masera is deeply remorseful for the negative impact his behavior and the resulting criminal prosecution have had on his family members. His sense of guilt has been overwhelming throughout these proceedings, and was especially difficult for him to handle initially. Mr. Masera initially found asking for help coping difficult, as he did not want to add to the burden he already placed on others; however, Mr. Masera has reached out to his family and community for support as he moves forward. The result has been positive and beneficial, as he now realizes that he has established a strong network of support for himself. While Mr. Masera's behavior in this case has negatively impacted them, their willingness to continue to support him will be a motivating factor for Mr. Masera moving forward with a law-abiding and productive lifestyle.

Mr. Masera's arrest on March 12, 2019 was a life-altering experience that led Mr. Masera to engage in significant self-reflection. For more seasoned offenders, one day in a jail cell would likely not induce the psychological and physiological response that Mr. Masera felt. But for him, as someone who had never had any negative contact with law enforcement or the criminal justice

---

1 The letters in support have been redacted in accordance with Fed. Crim.R. 49.1. Unredacted versions have been provided to U.S. Probation and counsel for the Government.

system, being placed in a cell with an individual claiming to be a convicted murderer not only made Mr. Masera's blood pressure skyrocket, but also jump-started his self-reflection into how he could allow himself to engage in conduct that led to his arrest. To this day, Mr. Masera struggles with the knowledge that his offense conduct is contrary to his values and the values he instilled in his children.

Mr. Masera has cooperated fully with the Government and is compliant with his cooperation agreement in this matter. Indeed, Mr. Masera pled guilty very early in the case and agreed to make his cooperation agreement public as part of his plea agreement. Beginning in 2019, he submitted to multiple debriefings in both California and Massachusetts. He was also prepared to testify for the Government in the jury trial conducted before Judge Gorton in 2021. Mr. Masera participated in multiple meetings with the Government in Massachusetts prior to the commencement of that trial and was in Boston during much of the proceedings, although he did not ultimately testify for the prosecution.

### *A term of imprisonment is not necessary to protect the public, as Mr. Masera is less likely to reoffend.*
### 18 U.S.C. § 3553(a)(2)(C)

A reasonable sentence should protect the public from further crimes of the defendant pursuant to § 3553(a)(2)(C). Mr. Masera presents a lesser risk of committing crimes in the future. His history, character, and condition are consistent with a person who presents a low risk for recidivism. Mr. Masera has a criminal history score of zero. (PSI, ¶ 101). Indeed, Mr. Masera has no prior arrests, juvenile adjudications, or adult criminal convictions whatsoever, and he has no other pending charges. (PSI, ¶¶ 98-99, 102-104). He has remained in compliance with all conditions of his release since he was arrested over three years ago on March 12, 2019.

In addition, Mr. Masera is less likely to reoffend because he has readily and clearly accepted responsibility for his actions and shown remorse through his conduct in this case. As this Court is aware, a guilty plea is an important step in the rehabilitative process. Mr. Masera's total cooperation with the Government and the Court and acceptance of responsibility provide additional evidence of his remorse and commitment to living a law-abiding life in the future. Therefore, a custodial sentence is not necessary to deter Mr. Masera from criminal conduct or to protect the public.

The United States Sentencing Commission overview of recidivism among federal offenders published in March of 2016 further supports a finding that Mr. Masera is less likely to reoffend due to his older age. Mr. Masera is seventy-two years old. "Studies have repeatedly shown that older offenders at sentencing are at lower risk for reoffending, and the Commission's research confirms these findings." United States Sentencing Commission, *Recidivism Among Federal Offenders: A Comprehensive Overview*, 23[2]. The rearrest rate for individuals who are older than sixty at the time of sentencing is 14%. *Id*. Comparatively, the rearrest rate for individuals who are between the ages of fifty-one and sixty at the time of sentencing is 21.7%. Further, Mr. Masera's criminal history computation of zero supports a finding that he is unlikely to reoffend. In the 2016 report, the commission noted that "[f]ully consistent with its previous recidivism studies, the Commission's present study found that recidivism rates are most closely correlated with total criminal history points. For example, 30.2 percent of offenders with zero total criminal history points were rearrested within eight years, compared to 81.5 percent of offenders with more than 10 total criminal history points." *Id*, at 18.

---

[2]Available at http://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2016/recidivism_overview.pdf.

The aberrant nature of this offense compared to the balance of Mr. Masera's law-abiding life is also noteworthy.   The United States Sentencing Commission has found that offenders with zero criminal history points, like Mr. Masera, have "lower rates of recidivism than offenders with one or more criminal history points."  UNITED STATES SENTENCING COMMISSION, RECIDIVISM AND THE "FIRST OFFENDER" 17 (May 2004)[3].   The Commission identified four characteristics associated with "less culpable criminal conduct: no use of violence or weapons; no bodily injury of a victim; a minor role or minimal participation in the instant offense, and acceptance of responsibility."  *Id.*, at 9-10, citing to the criteria under § 5C1.2.   All four of these characteristics are present in the instant matter.

### *A probationary sentence would provide Mr. Masera with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.* 18 U.S.C. § 3553(a)(2)(D)

The Court's sentence should provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner according to § 3553(a)(2)(D).   Mr. Masera graduated high school in 1967 and went on to receive an Associate degree in Art from Yuba College and a Bachelor of Science degree in Business Administration from California State University.   (PSI, ¶ 131).   He also has a lengthy employment history and has been with his current employer for nearly seven years.   (PSI, ¶¶ 133-139).

Mr. Masera does have a number of medical conditions requiring ongoing treatment and assessment, which may be effectively treated and managed in a nonresidential setting. Four of those issues are of particular relevance as this Court considers whether a custodial sentence is appropriate.

---

[3] Available at http://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2004/200405_Recidivism_First_Offender.pdf.

First, Mr. Masera suffers from chronic neck disc deterioration and nerve damage, as well as chronic left lumber radiculopathy with myelopathy. He is under the care of a spinal surgeon who has recommended follow-up appointments and consideration of spinal surgery. (PSI, ¶ 123). Second, Mr. Masera suffers from sleep apnea and uses a CPAP machine to sleep. (PSI, ¶124). Third, in January of 2022, Mr. Masera was diagnosed with a mild abdominal aortic aneurysm. (PSI, ¶ 125). Fourth, Mr. Masera was diagnosed with prostate cancer in 2021 and is under the care of an oncologist. That cancer is slow-growing but requires monitoring. (PSI, ¶ 126).

Fortunately for Mr. Masera, the above conditions are being managed by his physicians. However, a period of incarceration would make each of them more difficult to monitor and he would be separated from the providers who have been working with him for an extended period of time. Accordingly, undersigned counsel respectfully submit that a probationary sentence is the most effective way to provide Mr. Masera with needed medical care, as his health conditions are much easier to manage effectively if he is not incarcerated.

### *A probationary sentence is available and would be sufficient for this offense.*
### 18 U.S.C. § 3553(a)(3) and § 3553(a)(4)(A)

The Court's sentence should consider the kinds of sentences available and the sentencing range established for the applicable category of offense committed by the applicable category of defendant set forth in the guidelines under § 3553(a)(3) and § 3553(a)(4). In arriving at a sentence that is "sufficient, but not greater than necessary" to satisfy Congress' sentencing mandate, this Court is also asked to consider the kinds of sentences and the sentencing range called for by the advisory Guidelines and the applicable statutes. The applicable sentencing range called for by the advisory Guidelines is forty-six to fifty-seven months. The applicable statute triggered by Mr. Masera's conviction, 18 U.S.C. § 1962(d), establishes a maximum sentence of imprisonment of twenty years. Alternatively, this Court may sentence Mr. Masera to

a period of probation of not less than one nor more than five years.  18 U.S.C. § 3561(c)(1).  Mr. Masera respectfully submits that a probationary sentence is available and would be sufficient in this matter.

The Supreme Court of the United States has recognized that while less severe than imprisonment, imposition of a term of probation still subjects a defendant to serious consequences.  In *Gall v. United States*, 552 U.S. 38, 48-49, 128 S. Ct. 586, 595-596 (2007), the Court noted:

> We recognize that custodial sentences are qualitatively more severe than probationary sentences of equivalent terms. Offenders on probation are nonetheless subject to several standard conditions that substantially restrict their liberty. See *United States v. Knights*, 534 U.S. 112, 119, 122 S. Ct. 587, 151 L. Ed. 2d 497 (2001) ("Inherent in the very nature of probation is that probationers 'do not enjoy the absolute liberty to which every citizen is entitled'" (quoting *Griffin v. Wisconsin*, 483 U.S. 868, 874, 107 S. Ct. 3164, 97 L. Ed. 2d 709 (1987))). Probationers may not leave the judicial district, move, or change jobs without notifying, and in some cases receiving permission from, their probation officer or the court. They must report regularly to their probation officer, permit unannounced visits to their homes, refrain from associating with any person convicted of a felony, and refrain from excessive drinking. USSG § 5B1.3. Most probationers are also subject to individual "special conditions" imposed by the court. Gall, for instance, may not patronize any establishment that derives more than 50% of its revenue from the sale of alcohol, and must submit to random drug tests as directed by his probation officer. App. 109.

In *Gall*, the defendant was facing a guideline range of thirty to thirty-seven months.  Instead of imposing the minimum guideline range of thirty months, the trial court sentenced the defendant to probation for his participation in a drug conspiracy.  *Id.*, at 593-594.  A significant factor that distinguished the defendant in *Gall* from his co-defendants was his voluntary withdrawal from the conspiracy and criminal conduct prior to him being aware of any Government investigation.  *Id.*, at 592-593.

Mr. Masera's conduct is distinguishable from others involved because he, similar to the defendant in *Gall*, voluntarily withdrew from the racketeering conspiracy before any Government investigation began.  Mr. Masera resigned from his bookkeeper and accountant position with Mr.

13

Singer's entities around December of 2017. Federal law enforcement officials first became aware of some of the underlying activity in spring of 2018, from information provided by a parent involved in a separate federal investigation. Mr. Singer was then approached by federal officials in fall of 2018. Mr. Masera was arrested on March 12, 2019.

Further, Mr. Masera's conduct is distinguishable from others, as he had comparatively little to gain from his involvement. Mr. Masera was paid a set hourly rate and worked part-time for Mr. Singer. He did not receive bribes or payments like many others, both charged and uncharged, did throughout the conspiracy. Further, Mr. Masera did not engage in the use of the "side-door" entry for his own children. Indeed, unlike the many families who paid hundreds of thousands of dollars – or even over a million dollars – just to secure admission to a university, Mr. Masera never sought to receive any such benefit for his children or other family members. There was also a stark contrast in the financial benefits to Mr. Masera, who was paid fifty dollars an hour, and Mr. Singer. One example of this stark contrast was when Mr. Singer instructed Mr. Masera to transfer $514,000 from business accounts to Mr. Singer's personal account, which Mr. Singer intended to use to purchase a property in Florida. (PSI, ¶ 76). Alternatively, if the purchase was not completed, Mr. Singer informed Mr. Masera that he intended to use the funds to pay off the mortgage of his residence in Newport Beach, California. *Id.*

While probation is a less severe sentence than imprisonment, a period of probation would be sufficient in this matter. A period of probation would enable Mr. Masera to continue to affirmatively demonstrate to the Court that he is dedicated to resuming his life as a law-abiding and productive citizen. Probation would also allow him to continue monitoring and treating his serious medical issues. Further, pursuant to 18 U.S.C. § 3565(a), any violation of probation would subject Mr. Masera to the possibility of modified or enlarged conditions of probation, extension of

the term of probation imposed, and revocation of the sentence of probation and resentencing. Therefore, this Court would continue to have the ability to impose a more severe sentence in the future if necessary. Steven Masera respectfully submits that a sentence of probation is available and would be sufficient in this matter.

*A sentence below the guideline range would not be disparate compared to other sentences.*
**18 U.S.C. § 3553(a)(6)**

The Court's sentence should avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct according to § 3553(a)(6). The United States Sentencing Commission ("USSC") publishes facts about sentencing nationwide that can be useful in determining whether a particular sentence would be disparate compared to other sentences for the same conduct. According to the USSC, the average guideline minimum sentence for money laundering offenses was 107 months in fiscal years 2016 and 2020. United States Sentencing Commission, *Quick Facts Money Laundering Offenses*[4]. The average sentence imposed, on the other hand, was 68 months in fiscal year 2016 and 64 months in fiscal year 2020. In fiscal year 2020, 38.6% of money laundering offenders received a variance, and the average downward variance resulted in a sentence reduction of 48.9%. Of the remaining 61.4% of money laundering offenders who were sentenced under the Guidelines Manual, the majority (63.9%) received either a substantial assistance or other downward departure. The average sentence reduction for substantial assistance was 61.8%. *Id.*

Mr. Masera does not fit squarely within the "average" money laundering offender. His guideline minimum of forty-six months is less than half the average guideline minimum of 107

---

[4] Available https://www.ussc.gov/sites/default/files/pdf/research-and-publications/quick-facts/Money_Laundering_FY20.pdf.

months. Further, Mr. Masera is among the minority – 10.6% - of money laundering offenders who are classified as having minor or minimal participation in the offense. *Id.* Finally, Mr. Masera is thirty years older than the average age of forty-two for money laundering offenders.

A noncustodial sentence would also not create a disparity between Mr. Masera and other offenders whose offense level falls in Zone D. The United States Sentencing Commission found 12.4 percent of U.S. citizen offenders with sentencing ranges in Zone D received an alternative sentence in 2014. More specifically, 4.6 percent were sentenced to probation only, 3.2% were sentenced to probation were sentenced to probation with some form of community confinement or home detention, and 4.6% received a split sentence. UNITED STATES SENTENCING COMMISSION, ALTERNATIVE SENTENCING IN THE FEDERAL CRIMINAL JUSTICE SYSTEM 9 (May 2015)[5]. Those percentages were consistent with overall trends throughout the ten year period of review beginning in 2005.

Finally, a probationary sentence would not be disparate compared to Mr. Masera's co-defendants or the individuals charged in related cases.

**CONCLUSION:**

Steven Masera, through undersigned counsel, respectfully requests this Court consider all of the foregoing information when formulating an appropriate disposition in Mr. Masera's case. A term of imprisonment is not required to satisfy the concerns expressed in section 3553, and imposition of a period of probation would not create a disparity between Mr. Masera and other similarly situated offenders. For the foregoing reasons, Mr. Masera respectfully submits a probationary sentence departs from the applicable guideline range for justifiable reasons and is

---

[5] Available at http://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-projects-and-surveys/alternatives/20150617_Alternatives.pdf.

warranted pursuant to 18 U.S.C. § 3553.  As such, Mr. Masera respectfully requests this Court impose a sentence of a term of probation.

Respectfully submitted,
**Taft Stettinius & Hollister LLP**

**/s/ David H. Thomas**
DAVID H. THOMAS
Ohio Supreme Court No. 0071492
P: (614) 334-6199
dthomas@taftlaw.com

**/s/ Kathryn S. Wallrabenstein**
KATHRYN S. WALLRABENSTEIN
Ohio Supreme Court No. 0092172
65 East State Street, Suite 1000
Columbus, Ohio 43215
P: (614) 220-0238
F: (614) 221-2007
kwallrabenstein@taftlaw.com

Counsel for Defendant

**/s/ Philip Y. Kouyoumdjian**
PHILIP Y. KOUYOUMDJIAN
Massachusetts Bar No. 633443
14 Penn Plaza
225 West 34th Street, Suite 2102
New York, NY 10122
P: (917) 534-7180
F: (312) 966-8555
pkouyoumdjian@taftlaw.com

Local Counsel for Defendant

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that the foregoing was filed with the Clerk of Court for the United States District Court for the District of Massachusetts using the CM/ECF system, which will send notification of such filing to all counsel of record on May 6, 2022, by electronic mail.

/s/ **David H. Thomas**
DAVID H. THOMAS