UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | Criminal No. 19-10081-IT |
| ) | |
| STEVEN MASERA, ) | |
| ) | |
| Defendant ) | |

**GOVERNMENT'S SUPPLEMENTAL SENTENCING MEMORANDUM**

In accordance with the Court's May 9, 2022 order (Dkt. 1287), the government respectfully submits this supplemental sentencing memorandum addressing the relative culpability of defendant Steven Masera.

The defendants who have pleaded guilty in this case generally fall into one of two broad categories: parents who participated in the athletic recruitment and/or test-cheating aspect of Singer's scheme and facilitators of the scheme. Facilitators of the scheme include Singer and those who worked for his organization, university coaches and athletic department administrators, test administrators/proctors, and other intermediaries.

In the government's view, while they are not similarly situated,[1] Masera is less culpable than the parents who paid exorbitant sums to secure their children's admission to college as purported athletic recruits and/or to obtain inflated test scores for their children through cheating. The parents have varying degrees of culpability, but they all knowingly cheated the college

---

[1] *See, e.g., United States v. Brown*, 26 F.4th 48, 69 (1st Cir. 2022) (explaining that defendants with different "role[s] in the crime" are not similarly situated, and that "§ 3553(a)(6) does not ban all disparities, just 'unwarranted' ones"); *United States v. Ortiz-Islas*, 829 F.3d 19, 29 (1st Cir. 2016) (explaining that defendants with "varying [] roles in the crime" are not similarly situated).

admissions system in one way or another to attain an unearned advantage for their children. While Masera facilitated the financial transactions involved in the scheme, he did so at Singer's direction in the course of his ordinary job responsibilities, and he stood to gain nothing beyond his hourly compensation. Further, Masera did not have the level of insight into the scheme that most of the parents did. While he understood that certain payments were in exchange for admission, and that the university insiders were often associated with athletics, he was not involved in or aware of the details of the fraud – the fabricated athletic profiles and lies to admissions that virtually guaranteed these children athletic recruitment slots for which they were not qualified. Masera had even less insight into the test-cheating aspect of the scheme, knowing little to nothing about the purpose of the payments to administrators and proctors.

Likewise, the government believes that Masera is less culpable than the coaches and athletic department administrators who accepted bribes in exchange for falsely designating the children of Singer's clients as athletic recruits to facilitate their admission. The coaches and administrators not only violated the fiduciary duty they owed to their employers by lying to their colleagues in admissions, but also benefitted financially. Some of the coaches accepted hundreds of thousands – or, in the case of former Georgetown University tennis coach Gordon Ernst, millions – of dollars in bribes. While some directed the payments to university athletic funds, all but one – John Vandemoer (19-cr-10079-RWZ), who was sentenced to time served – either split the payments, with some of the money going to the university and some to them personally (*e.g.*, co-defendant William Ferguson and Michael Center, 19-cr-10116-RGS), or ultimately transitioned to accepting money to their pockets (*e.g.*, co-defendants Ali Khosroshahin, Laura Janke, and Donna Heinel).

Other facilitators of the scheme include: co-defendants Mikaela Sanford and Laura Janke, who, like Masera, worked for Singer's organization in some capacity; test administers/proctors, including co-defendants Igor Dvorskiy and Niki Williams and Mark Riddell (19-cr-10074-NMG); and other intermediaries, such as co-defendant Martin Fox. The government's initial sentencing submission set forth its view of Masera's culpability as compared to Riddell, Williams, and Fox, the only three facilitators who have been sentenced to date. With respect to those yet to be sentenced – Sanford, Janke, and Dvorskiy – the government respectfully submits that Masera is the least culpable.

As this Court is aware from her testimony in the trial of co-defendant Jovan Vavic, while an assistant coach of the USC women's soccer team, Janke, along with then-head coach Ali Khosroshahin, purported to recruit several of Singer's students to the USC women's soccer team – first, in exchange for payments to the program and, later, in exchange for payments to their private soccer club. Khosroshahin and Janke, knowing that Singer's students were not qualified and did not intend to play on their team, submitted false athletic credentials to fool USC's subcommittee on athletic admissions into approving their admission. After leaving USC, Janke continued to work with Singer, first acting as a go-between with co-defendant Donna Heinel to help get Singer's students admitted to USC as purported athletic recruits, and, later, creating falsified athletic profiles for the children of Singer's "side-door" clients. In addition to the reasons set forth above with respect to the coaches generally, Janke is more culpable than Masera in light of her central role in the fraud. On the other hand, the compensation Janke received in exchange for creating falsified athletic profiles was minimal (between $2,750 and $7,750, as compared to the approximately $356,047 she and Khosroshahin received in connection with side-door deals), and, like Masera, everything she did in that regard was at Singer's direction. Further, unlike

Riddell, without whom the test-cheating aspect of the scheme would not have worked, both Janke's and Masera's roles, while important, could have been filled by anyone willing to follow Singer's lead.

Dvorskiy was the director of West Hollywood College Prep ("WHCP"), one of the two high schools Singer used as a testing site to facilitate the test-cheating aspect of the scheme. Dvorskiy agreed to register WHCP as a testing site so that Singer's students could take the SAT and ACT with extended time there, and then allowed Riddell to cheat on the exams in exchange for money. While Dvorskiy had limited visibility into how the cheating worked, he took active steps to facilitate and conceal it. For example, at Singer's direction, Dvorskiy falsified the exam materials, listing himself or others as the proctor to conceal Riddell's involvement and falsely indicating that students took the exam over two days, consistent with the requirements for extended time, as opposed to the one day the students actually took to complete the exams. Over the course of his participation in the scheme, Dvorskiy facilitated cheating on approximately 20 exams and received approximately $200,000 in exchange. Given his important role, and the degree to which he benefitted financially, Dvorskiy is more culpable than Masera, although not significantly so considering that they both had fairly limited insight into the details of the scheme and both knowingly falsified documentation to conceal the scheme.

Finally, Sanford worked as a project manager/assistant for Singer and, in that role, participated in both the legitimate aspects of his business (*e.g.*, arranging college tours, hiring tutors, and coordinating the submission of students' college applications), and some of the illegitimate aspects, such as taking classes for students, adding false demographic and activity information to applications, changing test locations for students taking the SAT or ACT at WHCP or the Houston test center, and completing NCAA registrations for students who were admitted

through the side door. Sanford's visibility into the scheme was somewhat limited. For example, she generally did not have awareness of the bribe payments made in connection with the athletic recruitment and test-cheating aspects of the scheme, and she was not aware that cheating was occurring when a test site was moved. At the same time, Sanford did have some insight into the athletic recruitment aspect of the scheme, as she would insert athletic activities on students' applications for certain schools (*e.g.*, USC), but not others. She was also copied on emails where it was evident the students did not play the sport or where the exchange of money was discussed. In addition, Sanford was fully aware of the class-taking "services" offered by Singer: she took, or hired a friend to take, classes for at least 11 students and received approximately $67,062.50 (separate from her ordinary compensation) for taking classes on behalf of Singer's students.

Masera and Sanford are similarly situated in some respects. They both worked for Singer's organization and participated in both the legitimate and some illegitimate aspects of his business, all at Singer's direction. But because of their different roles, Masera had more insight into the purpose of the side-door payments, whereas Sanford had more insight into the fraud. While Masera's involvement was limited to facilitating the financial aspects of the scheme, he had knowledge that Sanford did not regarding the sham nature of KWF and its use as a façade through which bribe payments were funneled, disguised as charitable contributions. In addition, Masera created fraudulent donation receipt letters and fake invoices to allow parents to write their payments off as purported donations or business expenses. If it were not for Sanford's involvement in the class-taking, and the personal financial benefit she received in exchange, she would arguably be less culpable than, or at least equally culpable to, Masera. But taking the class-taking into account and considering her role in falsifying students' college applications, the government submits that Sanford is slightly more culpable than Masera.

This memorandum is meant to address the relative culpability of defendants who have pleaded guilty in this case solely in terms of their conduct, as that is the government's understanding of the Court's request. To the extent the Court seeks the government's view of the relative value of cooperating defendants' substantial assistance, or an evaluation of their personal circumstances, the government will be prepared to address those issues at sentencing.

Respectfully submitted,

RACHAEL S. ROLLINS
United States Attorney

By: */s/ Leslie A. Wright*
LESLIE A. WRIGHT
KRISTEN A. KEARNEY
IAN J. STEARNS
STEPHEN E. FRANK
Assistant United States Attorneys

**Certificate of Service**

I hereby certify that this document was filed through the ECF system on May 10, 2022 and will be sent electronically to the registered participants identified on the Notice of Electronic Filing (NEF).

By: */s/ Leslie A. Wright*
LESLIE A. WRIGHT
Assistant United States Attorney